Matter of Aungst v Family Dollar (2025 NY Slip Op 06530)

Matter of Aungst v Family Dollar

2025 NY Slip Op 06530

Decided on November 24, 2025

Court of Appeals

Singas, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 24, 2025

No. 92 

[*1]Frank Aungst, Respondent,
v
Family Dollar et al., Appellants. Workers' Compensation Board, Respondent.

Cory A. DeCresenza, for appellants.
Laura Etlinger, for respondent New York State Workers' Compensation Board.
Mark C. Somers, for respondent Frank Aungst.

SINGAS, J.

To determine whether COVID-19 is an injury sustained in the course of employment, the Workers' Compensation Board (Board) considers evidence of the virus's "prevalence" in the claimant's workplace. Employing this "prevalence" framework in the
present case, the Board concluded that claimant's COVID-19 and consequential injuries were compensable. We reject employer's argument that this "prevalence" formulation is incompatible with the Workers' Compensation Law and conclude that the Board's decision is supported by substantial evidence. We thus affirm.
I.
In April 2020, shortly after the onset of the global COVID-19 pandemic,[FN1] claimant worked as a store manager for employer when he contracted the disease. Approximately one week later, claimant suffered a stroke. Claimant thereafter filed a claim for workers' compensation benefits alleging that he contracted COVID-19 due to exposure to the virus "[a]t the job site" and that his stroke was a direct result of the disease. Employer controverted the claim.
At a hearing, claimant testified that he worked full time in a high-volume store during March and April 2020. According to claimant, his job responsibilities involved almost constant contact with the public, working either on the store floor or as a cashier. Claimant testified that employer did not provide store employees with sneeze guards or protective face masks until mid-April 2020. Although employer had a policy requiring customers to socially distance and wear face masks in the store, claimant explained that management advised employees not to enforce that policy. Many customers did not wear face masks, and claimant recounted specific instances of close contact with customers despite employer's social-distancing policy.
Claimant tested positive for the virus on April 23, 2020, and on May 1, he suffered a stroke and was hospitalized for four months. Claimant continued to test positive after he was admitted to the hospital. Claimant testified that, in the two to three weeks leading up to his positive test, he worked 50 or more hours per week at the store in a retail role deemed "essential" and thus exempted from emergency restrictions on public gatherings and commercial activities. He drove alone to and from work and did not leave the country, visit family members or friends, or use public transportation. Claimant further explained that during the relevant period, he lived alone, did not see the only other tenant in his building, and did very little shopping. His only other significant contacts with members of the public were during medical appointments twice a week at a health clinic that followed COVID-19 safety protocols, including social distancing in the waiting room and protective masking by staff.
Claimant's vascular neurologist, among other medical professionals, opined that there was a connection between claimant's COVID-19 diagnosis and subsequent stroke. According to the neurologist, claimant did not exhibit typical risk factors for a stroke, and claimant experienced a "classic pattern" of a COVID-19-related stroke that presents in up to five percent of COVID-19 patients.
The Workers' Compensation Law Judge (WCLJ) established the claim, and the Board agreed.[FN2] The Board determined that relevant case law "indicate[d] that if a claimant contracts COVID-19 through close contact with the public, such exposure could be found to be a work-related accident within the meaning of [Workers' Compensation Law] § 2 (7)." According to the Board, a claimant can demonstrate this by showing COVID-19's "prevalence" in the workplace:
"Prevalence is evidence of significantly elevated hazards of environmental exposure that are endemic to or in a workplace which demonstrates that the level of exposure is extraordinary. A claimant may demonstrate prevalence through evidence of the nature and extent of work activities, which must include significant contact with the public and/or co-workers in an area where COVID-19 is prevalent" (see also New York State Workers' Compensation Board, COVID-19 & Workers' Compensation Q & A [June 2020], available at https://www.wcb.ny.gov/content/main/TheBoard/covid-19-workers-compensation-q-a-june-2020.pdf).
Crediting claimant's testimony and his medical experts' opinions, the Board found sufficient evidence in the record to conclude "that an accident arose in the course of . . . claimant's employment resulting in a causally related COVID-19 infection" and "claimant sustained a consequential stroke."
The Appellate Division affirmed (see 221 AD3d 1222 [3d Dept 2023]). We granted employer leave to appeal (see 41 NY3d 908 [2024]).
[*2]II.
Workers' Compensation Law § 10 (1) entitles an employee to compensation for all injuries "arising out of and in the course of the employment." Workers' Compensation Law § 2 (7), in turn, defines "injury" as "only accidental injuries arising out of and in the course of employment and such disease or infection as may naturally and unavoidably result therefrom." An injury arises out of employment if there is "a causal relationship or nexus between the accident and the employment" (Matter of Lemon v New York City Tr. Auth., 72 NY2d 324, 327 [1988]). A claimant bears the burden of showing that their injuries "were sustained in the course of [their] employment and arose out of the employment" (Malacarne v City of Yonkers Parking Auth., 41 NY2d 189, 193 [1976] [internal quotation marks omitted]).
Employer's argument that the Board's "prevalence" framework is inconsistent with these principles focuses on our decision in Matter of Lerner v Rump Bros (241 NY 153 [1925]). In Matter of Lerner, analyzing the Workers' Compensation Law's predecessor, we held that an employee has "the right to recover an award when a disease . . . is developed during the course of the employment" only where "the inception of the disease [is] assignable to a determinate or single act, identified in space or time," and is "assignable to something catastrophic or extraordinary" (id. at 155). Employer contends that Matter of Lerner, when applied in the COVID-19 context, requires a claimant to identify a specific workplace exposure that caused their injuries. The Board's "prevalence" framework, according to employer, improperly relieves claimants of this burden.
However, our more recent precedent has repudiated this cramped reading of Matter of Lerner. We have since clarified that an injury need not be precisely "identified in space or time" or attributable to a singular "catastrophic or extraordinary" event to be a compensable accident (Matter of Masse v Robinson Co., 301 NY 34, 36 [1950] [internal quotation marks and citations omitted]). Instead, courts determine whether an event is accidental in this context "not by any legal definition, but by the common-sense viewpoint of the average [person]" (id. at 37). In Matter of Middleton v Coxsackie Correctional Facility, applying the commonsense-viewpoint standard in the context of infectious diseases, we explained that Matter of Lerner's "time-definiteness" requirement
"can be thought of as applying to either the cause or the result, so that there can be a compensable accident where there is an exposure to a condition over a protracted period during which the victim succumbs to a disease culminating in a relatively sudden collapse; and it is not decisive that a claimant is unable to pinpoint the exact date on which the incident occurred" (38 NY2d 130, 135 [1975] [citations omitted]).
Noting that numerous awards based on diseases, including those caused by germs, had been sustained as accidental work-related injuries, we determined that the claimant correction officer's tuberculosis was a compensable injury because he was exposed to "persistent coughs by [an] inmate with active tuberculosis over a period of three or four months, for two to three hours a day, while within a foot from [the] claimant" (id. at 136). Based on this, "[n]ot only was there substantial evidence from which the board could determine that this was an accident gauged by the common-sense viewpoint of the average [person], but the time-definiteness required of an accident was satisfied by application to the result," because "the inception of the tuberculosis was a determinable event assignable . . . to the repeated traumata due to the persistent coughing, and which were extraordinary in nature" (id. at 137). In reaching this conclusion, we favorably cited, among other cases, Matter of McDonough v Whitney Point Cent. School, where the Appellate Division sustained an award to a teacher who contracted mumps after "expos[ure] to an unusual amount [*3]of germs . . . while teaching," including via "close contact with pupils in her classroom, 8 or 10 of whom contracted the disease" (15 AD2d 191, 193 [1961]).
More recently, in Matter of Johannesen, we sustained the claimant's award for bronchial asthma aggravated by exposure to tobacco smoke and dust in her workplace, noting that this exposure constituted an "accident" because the claimant "was required to work in an unventilated office and forced to share the polluted atmosphere with numerous smokers, who were all around her" (84 NY2d 129, 137 [1994]). We explained that claimants are required to show "unusual environmental conditions or events assignable to something extraordinary that caused an accidental injury" (id. at 138). The claimant in Matter of Johannesen met this burden because she faced "seriously adverse environmental conditions" (84 NY2d at 137). Though we recognized that "exposure to cigarette smoke in our society and in workplaces may have been and still is relatively endemic," the claimant's exposure was "extraordinary" because it "demonstrate[d] an exacerbative and excessive quality" when viewed through Matter of Middleton's "common sense" lens (id.).
Thus, under our case law, to establish that an illness due to exposure to pathogens or adverse environmental conditions is compensable, a claimant must demonstrate that the illness was caused by "extraordinary" workplace exposure (see Matter of Johannesen, 84 NY2d at 137, 138; Matter of Middleton, 38 NY3d at 136, 137). Consistent with that requirement, the Board's "prevalence" framework requires a claimant to show a "significantly elevated" risk of exposure, closely mirroring Matter of Johannesen's references to "exacerbative and excessive" exposure to smoke and the "unusual environmental conditions" that the claimant there faced (84 NY2d at 137, 138). As applied to COVID-19, the "prevalence" framework specifically requires a claimant to demonstrate an "extraordinary" level of exposure through evidence of frequent contact with the public or co-workers "in an area where COVID-19 is prevalent." It thus recognizes, as have our prior cases, that persistent, high-risk exposure to a disease in the workplace culminating in infection can constitute a compensable accident (see Matter of Middleton, 38 NY2d at 136).
Nor does the "prevalence" framework relieve a claimant of their burden to demonstrate that their infection resulted from such work-related exposure. We have never limited proof of this causal link to evidence of a specific source of exposure. To the contrary, any evidence sufficient to demonstrate that a disease resulted from extraordinary work-related exposure, as opposed to some other source, may be adequate to demonstrate a compensable injury. Indeed, the difference between evidence showing workplace exposure to (1) an individual who was infected, like in Matter of Middleton, (2) a group of people who were infected, like in Matter of McDonough, or (3) many members of the public, a large proportion of whom were infected, as the "prevalence" framework contemplates, is ultimately a question of degrees of proof. Employer's argument that the Board is applying an errant legal standard therefore lacks merit.
In sum, the Board's application of the "prevalence" framework is not inconsistent with the Workers' Compensation Law as we have interpreted it.
III.
Because the Board's use of the "prevalence" framework did not violate the Workers' Compensation Law, we must uphold the Board's decision if it was supported by substantial evidence (see Matter of Gates v McBride Transp., 60 NY2d 670, 671 [1983]). We have "emphasize[d] that the substantial evidence standard is a minimal standard" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045 [2018] [internal quotation marks and brackets omitted]), "less than a preponderance of the evidence" (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 180 [1978]), and "demands only that a given inference is reasonable and plausible, not necessarily the most probable" (Matter of Haug, 32 NY3d at 1046 [internal quotation marks omitted]). "Stated differently, '[r]ationality is what is reviewed under . . . the substantial evidence rule' " (id., quoting Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). When the Board relies on an expert medical opinion, the opinion must be based on the facts and not "surmise of what might have been" (Matter of Palermo v Gallucci & Sons, 5 NY2d 529, 535-536 [1959] [internal quotation marks omitted]). An expert's opinion of causal connection, however, need not be stated in "terms of infallibility or scientifically determined certainty" (Matter of Ernest v Boggs Lake Estates, 12 NY2d 414, 415 [1963]). The determination to credit one medical opinion over another "is entirely within the province of the Board and outside the limited jurisdiction of this [C]ourt" (Matter of Palermo, 5 NY2d at 532).
First, substantial evidence supports the Board's finding that claimant's COVID-19 was an accidental injury arising out of claimant's employment. At the hearing, claimant submitted evidence of the virus's rapid spread in the area where the store was located during the time in question. Claimant worked in a busy, essential retail role. The [*4]store was frequented by members of the public, only some of whom wore face masks and complied with employer's social-distancing policy. Claimant was "constantly" in close proximity with these customers. Claimant and employer's other employees were instructed not to enforce masking and social-distancing rules, and claimant was not given a protective face mask to wear at work until mid-April. Given evidence that COVID-19 was a highly communicable respiratory disease transmitted through in-person contact, the Board rationally concluded that claimant's workplace conditions significantly elevated his risk of contracting COVID-19 above the ordinary.
Moreover, claimant testified that when he contracted COVID-19 in April 2020, he was spending significant time at the store, working 50 or more hours a week. By contrast, other evidence tended to show that claimant's infection did not stem from any source outside of work. Claimant lived alone and did not use public transportation. He had not traveled or visited family or friends in the weeks prior to testing positive for the virus. His only other significant contacts with members of the public were at twice-weekly medical appointments where COVID-19 safety protocols were followed. Based on this evidence, it was "reasonable and plausible" for the Board to conclude that claimant faced an extraordinary risk of exposure to the virus at work and contracted COVID-19 as a result of that exposure.
Second, substantial evidence also supports the Board's determination that claimant's stroke was compensable as a consequential injury. Claimant's treating neurologist opined that his stroke resulted from his COVID-19 and explained that claimant did not have other common risk factors for stroke. The neurologist also stated that those with COVID-19 face elevated risks of blood clots and stroke, which affect up to five percent of such patients, and that the type and timing of claimant's stroke were consistent with a COVID-19-related stroke. He similarly ruled out other possible causes. Because this opinion was based on the medical evidence and not mere speculation, the Board was entitled to credit it, notwithstanding employer's expert's contrary opinion.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Order affirmed, with costs. Opinion by Judge Singas. Chief Judge Wilson and Judges Rivera, Garcia, Cannataro, Troutman and Halligan concur.
Decided November 24, 2025

Footnotes

Footnote 1: COVID-19 is an infectious disease caused by the SARS-CoV-2 virus. We refer to both the disease and the virus as "COVID-19" for ease of exposition.

Footnote 2: The WCLJ established the claim as an occupational disease and a consequential stroke. The Board modified to reflect that claimant established an accidental injury rather than an occupational disease, and otherwise affirmed.